UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:07-CV-337-H

MICHAEL McKIM PLAINTIFF

VS.

NEWMARKET TECHNOLOGY, INC. DEFENDANT

**MEMORANDUM OPINION**

Plaintiff Michael McKim ("McKim") alleges breach of contract, fraud, and seeks declaratory relief against Defendant NewMarket Technologies, Inc. ("NewMarket"). This dispute actually began nine (9) years ago. Now three lawsuits and two botched settlements later, the parties remain unable to resolve the loose ends of the latest disputed settlement. The parties have agreed, however, to resolve this matter in its entirety by submitting and responding to competing motions for summary judgment.

The Court has had the benefit of oral argument by the parties. At oral argument, the parties agreed that the Court's task was to determine whether, as NewMarket contends, the settlement terms contemplated also signing a subscription agreement or, as McKim contends, the subscription agreement added material terms to the parties' agreement which altered McKim's rights under the agreement. The Court does not find that the subscription agreement adds new and material conditions to the settlement.

For the reasons stated below, and after thorough review of the parties' briefs and exhibits, the Court sustains NewMarket's motion for summary judgment and denies McKim's motion for

summary judgment.

I.

The parties agree that there are no genuine issues of material fact. Moreover, the events leading up to the current dispute are relatively straightforward. Until September 17, 1999 when he voluntarily resigned, McKim was employed as Vice President of Research and Development for IPVoice Communications, Inc. (now NewMarket).[1] In 2000 McKim sued NewMarket in this Court to recover 1,050,000 shares of NewMarket stock to which he believed he was entitled under the terms of his employment agreement with NewMarket. The parties reached a written Mutual Release and Settlement Agreement which provided McKim with $5,000 payable in seven installments and for 350,000 shares of NewMarket stock with piggyback registration rights and this Court dismissed McKim's lawsuit as settled. The same day that it executed the settlement agreement, NewMarket's board voted to reverse split its stock on a thirty (30) shares to one (1) basis. Consequently, NewMarket delivered to McKim only 11,667 shares, or 1/30th of the number of shares recited in the Settlement Agreement. Although the split reduced the number of shares McKim received, the percentage of shares and the dollar value remained unchanged. McKim also received six of the seven cash installment payments from NewMarket.

McKim objected to delivery of only 11,667 shares instead of the 350,000 recited in the Settlement Agreement, and in 2004 he sued NewMarket again in this Court claiming that the reverse split constituted fraud and breach of contract. McKim sought a declaration of his rights

---

[1]Over the course of the parties' dispute, Defendant, NewMarket has been formerly known as IPVoice Communications, Inc. ("IPVoice")and Vergetech. "NewMarket", "IPVoice", and "Vergetech" describe the same corporate entity, which is the defendant in this lawsuit. For clarity, the Court will refer to the entity as "NewMarket" throughout the opinion.

pursuant to the parties' Settlement Agreement.[2] The parties agreed to participate in mediation which was conducted by Magistrate Judge Whalin on November 16, 2004. At the mediation, NewMarket agreed to provide an additional 300,000 shares of stock to McKim. Magistrate Judge Whalin created a document outlining the terms to which the parties had agreed and that document was executed by counsel for both parties and by McKim.[3] According to McKim, the primary issue left unresolved at the mediation was the timing under which the additional shares would be freely tradable by McKim. According to McKim, "[a] legal question as to the application of Securities and Exchange Commission Rule 144 would determine if the shares had to be held for a year from issue or if, because they were issued enforcing the 2002 settlement such period would have already run." McKim says that "the primary factors" motivating his decision to settle were the November 2004 share value of $190,000 and the NewMarket CEO's "representations that the transaction would close quickly and that shares would increase in value." Pl.'s Mot. for Summ. J. 14.

The settlement conference with Magistrate Judge Whalin continued by phone on December 3, 2004 and December 15, 2004. During that time the parties continued to negotiate the details of the settlement. On December 13, 2004, NewMarket's counsel sent the following e-mail to McKim's counsel:

> Trace–IPVoice has authorized me to make one final settlement offer of 300,000 shares of restricted stock in

---

[2]McKim had also returned the final installment payment of $1000 because it was issued as a check bearing the restrictive endorsement "Paid in full," which he refused to negotiate because of his disagreement regarding the number of shares IPVoice had issued to him.

[3]According to McKim, a copy of this handwritten document "does not survive." Pl.'s Mot. for Summ. J. 1.

> addition to the 11,667 shares already issued, the opinion letter, and the issuance schedule "with teeth." IPVoice will not tender any cash to McKim nor will it provide a non-dilution agreement to him (even though his lawsuit will not motivate the company to dilute his stock). I hope this is acceptable . . .

Pl.'s Mot. for Summ. J. Exh. 1. On January 5, 2005, counsel for NewMarket sent Magistrate Judge Whalin the following letter:

> This confirms the settlement conversations Trace Champagne and I had yesterday. Mr. Champagne and I have agreed to resolve the above-referenced matter on behalf of our clients. The parameters of the settlement agreement include the issuance of 300,000 shares restricted IPVoice stock to Mr. McKim and the 11,667 shares of IPVoice stock previously issued to Mr. McKim, a confidentiality agreement, and a cash payment of $5,000 to Mr. McKim and the reissuance fo the $1,000 check previously issued by IPVoice to Mr. McKim. In addition, IPVoice will also provide an opinion letter from counsel as to when the 300,000 shares and the 11,667 shares of IPVoice stock may be eligible for free trading. In addition, the parties will negotiate appropriate language to ensure that the 300,000 shares of restricted stock are issued in a timely manner. . . .We will prepare a more formal settlement agreement and will keep the Court updated on the matter . . .

Compl. Exh. 6. The next day, January 6, 2005, this Court dismissed the lawsuit as settled, with leave to reinstate within thirty days.

The parties exchanged written drafts memorializing their settlement agreement on January 14, 2005 and again on January 28, 2005. At that time, NewMarket's counsel advised McKim's counsel that its firm's "only securities lawyer," Maria Doyle ("Doyle"), would be away from the office until at least Monday, January 31, 2005. When she returned, Doyle identified several securities issue surrounding the additional issuance of 300,000 shares of NewMarket's stock, and she apparently alerted her co-counsel of the possibility that a subscription agreement for the issuance of the additional stock "may be necessary in order to

protect IPVoice and NewMarket."

Communications between the parties' counsel continued and on February 10, 2005, NewMarket's counsel forwarded a revised version of the settlement agreement to McKim's counsel in the form of an attachment to the following e-mail:

> Trace – I have been advised that the transfer agent cannot issue the stock certificate until the agreement is signed. If there are no further revisions to the agreement, have Mike sign it and fax me his signature so that it can be forwarded to the transfer agent. I have heard no further comments from my client on the settlement agreement so I am planning to go forward with the latest draft I e-mailed to you this morning.
>
> Maria [Doyle] said she should have a letter ready Monday night, but it looks like I will be in Dallas on Monday and Tuesday. So Wednesday [February 16, 2005] appears to be the day to close this out.

Compl. Exh. 11. McKim signed and faxed the document to NewMarket's counsel the next day, February 11, 2005. The relevant terms of that document include: ¶2(d) which provides "300,000 shares of NewMarket Technology (trading symbol NMKT.OB) common stock with a one-year trading restriction;" and ¶2(g) which states that "[i]f it becomes possible for McKim's restricted shares to become unrestricted or trade at a date earlier than February 20, 2006, [NewMarket] shall use its best efforts to insure that the restrictions on McKim's shares are lifted and available for trade at the earliest possible date." Compl. Exh. 11. Paragraph 2(h) required NewMarket to pay McKim a late fee of $250/day for each day NewMarket is late in performing its contractual duties.

On the eve of the scheduled closing, NewMarket's counsel advised McKim's counsel via e-mail that Defendant's counsel's firm's professional liability coverage precluded it from

"preparing SEC filings and doing securities-related opinions for publicly traded companies . . ." NewMarket also advised that its "approved SEC counsel must do the type of opinion McKim is seeking [regarding the tradability of shares]." Def.'s Mot. for Summ. J. Exh. S.

On February 28, 2005, after NewMarket's counsel had discussed the securities issues raised by the proposed settlement with NewMarket's approved SEC counsel, it forwarded a revised settlement agreement that, among other changes, required that McKim execute a subscription agreement in conjunction with the issuance of the NewMarket shares. McKim objected to a subscription agreement, apparently prior to having reviewed its proposed terms. He viewed the subscription agreement, which had not been mentioned during the mediation conducted by Magistrate Judge Whalin, as imposing additional burdens on and restriction to an "already settled matter." McKim intended to trade the stock as soon as legally possible and his strained relationship with NewMarket apparently left him somewhat suspicious that the subscription agreement was NewMarket's effort to make trading more difficult.

In mid-March 2005, NewMarket's counsel forwarded to McKim's counsel a draft letter from NewMarket's securities counsel summarizing the requirements of Rule 144 under the Securities Act with respect to the proposed issuance of NewMarket stock to McKim. The letter described the steps that would be necessary to lift the restrictive legend once the stock became freely tradable. In particular, the letter described the legal opinion letter that NewMarket's transfer agent would have to receive from NewMarket's "outside counsel" before the transfer agent would lift the restrictive legend. In e-mail correspondence, McKim's counsel said the draft "looked fine" and raised questions about who would pay for the opinion letter. Def.'s Mot. for Summ. J. Exh.W.

In October 2005, NewMarket tendered to McKim a sixth written version memorializing the settlement agreement, which included a copy of the proposed subscription agreement. The proposed subscription agreement requires that McKim be an "accredited investor." Compl. Exh. 14. Paragraph 2 of the proposed subscription agreement states:

> The shares have not been registered under the Securities Act of 1933, as amended (the "Act") and accordingly, cannot be sold, transferred, hypothecated, assigned or otherwise disposed of, unless such Shares are registered under the Act, or if in the opinion of counsel, satisfactory to the Company, such sale, transfer, hypothecation, assignment or disposition is exempt from such registration requirements.

Compl. Exh. 14. Paragraph 5 states, "As set forth in Subparagraph 4(iv) herein, the undersigned acknowledges that he is to consult with and rely on his own advisors as to the possible risks and benefit arising out of an investment in the Company and the transferability fo the Shares." Compl. Exh. 14.

Over the next year, McKim steadfastly refused to sign the subscription agreement despite NewMarket's offer to increase the number of shares offered from 300,000 to 450,000. As a result of this impasse, in June 2007, the parties attempted to seek Magistrate Judge Whalin's assistance in determining their rights and responsibilities under the settlement agreement. Because well over two years had passed since this Court dismissed the case as settled, Magistrate Judge Whalin expressed serious concerns regarding the Court's continued subject matter jurisdiction. He gave leave, however, for McKim to file a formal motion to re-open or to file a separate action for breach of contract. On June 27, 2007 McKim filed the pending action against NewMarket.

II.

McKim asks the Court to find that NewMarket breached the settlement agreement, and committed fraud by "engag[ing] in a pattern of deceptive behavior to thwart its performance" under the 2002 and 2004 settlements. In McKim's view, the subscription agreement imposes additional burdens not contemplated by the parties' settlement agreement. NewMarket characterizes the subscription agreement as simply an additional document necessary to protect it under applicable securities laws and regulations and says that its delay in performance of the settlement terms is solely a function of McKim's refusal to execute the subscription agreement, borne of his "ignorance of the realities of the securities laws."

Sitting in diversity, this Court must apply Kentucky Law. Under Kentucky case law, a settlement agreement is "a type of contract . . . governed by contract law." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). Such an agreement is valid if it satisfies the requirements generally associated with contracts, including an offer and acceptance, full and complete terms, and mutual concessions of opposing claims. *Hines v. Thomas Jefferson Fire Ins. Co.*, 267 S.W.2d 709, 711 (Ky. 1954). Here, McKim does not dispute that the January 5, 2005 letter from NewMarket's counsel to Magistrate Judge Whalin reflects the parameters of the parties' oral settlement agreement, in reliance upon which his federal lawsuit was dismissed with prejudice. Accordingly, "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear*, 103 S.W.3d at 105 (quoting *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)).

The Court must first determine whether the settlement agreement's terms are ambiguous or "capable of more than one different, reasonable interpretation." *Id.* at 105-06; *Central Bank*

& *Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981). "If an ambiguity exists, 'the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written,' by evaluating extrinsic evidence as to the parties' intentions." *Id.* at 106 (quoting *Whitlow v. Whitlow*, 267 S.W.3d 739, 740 (Ky. 1954)). By contrast, where there is no ambiguity, the Court must enforce the contract "'strictly according to its terms' . . . by assigning language to its ordinary meaning and without resort to extrinsic evidence." *Id.* (quoting *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)).

Here, McKim argues that the settlement terms had been consistently, fully, and unambiguously laid out between NewMarket's counsel's e-mail of December 13, 2004, in the January 5, 2005 confirmation letter to Magistrate Judge Whalin, and in the February 11, 2005 draft of the Settlement Agreement which McKim signed and returned to NewMarket's counsel. Because none of these documents mentions a subscription agreement, McKim argues that NewMarket's subsequent insistence that he execute a subscription agreement exceeded the scope of the parties' agreement and "served as an additional restriction to handcuff him from seeking a legal means of trading the shares." Pl.'s Resp. to Def.'s Mot. for Summ. J. 7.

Contrary to McKim's assertion, however, upon review of these documents, the Court finds sufficient ambiguity in the terms of the parties agreement to permit consideration of extrinsic evidence in determining the parties' intentions. First, the December 13, 2004 e-mail from NewMarket's counsel, is, by its terms an "offer" and is not a description of terms of an already-reached settlement. A comparison of this e-mail to those described in the January 5, 2005 letter from NewMarket's counsel to Magistrate Judge Whalin reveals that the settlement's

terms were still in negotiation. *Compare* "IPVoice will not tender an cash to McKim" Pl.'s Mot. for Summ. J. Exh. 1 *with* "[t]he parameters of the settlement include . . .a cash payment of $5,000 to Mr. McKim." Compl. Exh. 6.

Moreover, the January 5, 2005 letter to Magistrate Judge Whalin describes the "parameters," not the complete terms of the parties' settlement. Several of the terms found in the February 11 draft settlement were not mentioned in the January 5 letter to Magistrate Judge Whalin. Thus, the January 5 letter cannot constitute the full embodiment of the parties' agreement. For example, that letter does not mention the "general release" nor the non-disparagement clause, which McKim apparently did not object to when he signed the February 10, 2005 draft Settlement Agreement. The January 5 letter also indicates that "the parties will negotiate appropriate language to ensure that the 300,000 shares of restricted stock are issued in a timely manner." Such language clearly indicates that the parties continued to formulate the details of how their agreement would be effectuated.

McKim acknowledges that the parties actions taken after the January 5 letter to Magistrate Judge Whalin and subsequent dismissal of the lawsuit was "merely preparation of the formal documents reciting the deal already in place." Pl.'s Resp. To Def.'s Mot. for Summ. J. 4. In fact, although neither party referenced it in its argument, the February 11 draft of the Settlement Agreement that McKim signed contains the following term, ¶9(h), "Each party shall execute such additional documents and take such further actions as shall be reasonable and necessary to carry out the provisions of this Agreement." Pl.'s Exh. 12. Considering the nature and scope of the parties' e-mail communications, correspondence with the Court, and the draft of the Settlement Agreement, the Court is persuaded that ambiguity exists as to whether a

subscription agreement was among those "additional document[s]" which would be "reasonable and necessary to carry out the provisions" of the parties' agreement.

III.

Having found the details of the execution of the parties' agreement to be "capable of more than one different, reasonable interpretation," *Kincaid*, 617 S.W.2d at 33, the Court must "gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Whitlow*, 267 S.W.3d at 740. This necessarily entails a review of the proposed subscription agreement.

In order to fully understand the contract and the parties' intentions, the Court briefly reviews the statutory and regulatory requirements of the Securities Act of 1933 ("the Securities Act") 15 U.S.C. § § 77a *et seq.*. The Act requires that all stock shares be registered with the Securities and Exchange Commission ("SEC") prior to issuance *unless* the securities fit within one of the statutory exemptions from the registration requirement. Among the exempted transactions are those "by an issuer not involving any public offering." 15 U.S.C. §77d (2). The exemption does not apply, however, if the stock is issued to an "underwriter" which is a "person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with the distribution of any security." 15 U.S.C. §77(b)(11). The SEC has promulgated rules in Regulation D describing certain qualifications that, if met, ensure that an investor is not an "underwriter," which is important because if the investor is deemed an underwriter, the exemption would be lost. Regulation D also describe certain conditions that, if satisfied, will be deemed transactions "not involving a public offering," thus satisfying the §77d(2) exemption.

Relevant to the transaction at issue here is 17 C.F.R. §230.506 ("Rule 506") which provides that a transaction with an "accredited investor" will be deemed not to involve an underwriter or a public offering. Regulation D also provides that the "issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters. . ." 17 C.F.R. § 230.502.[4]

NewMarket says that in requesting a subscription agreement it "merely sought to establish the requisite reasonable belief that McKim is a qualified individual and does not intend to redistribute the stock" in violation of the Securities Act. Def.'s Resp. to Pl.'s Mot. for Summ J. 9. A subscription agreement, it argues, is the usual way that an issuer satisfies the regulatory requirements to prove that a particular transaction qualifies for a statutory exemption from SEC registration. By requiring McKim to agree that he qualifies as an "accredited investor" and does not intend to redistribute the stock at the time of acquisition, NewMarket sought to ensure that performance of its settlement agreement obligations would not subject it to potential civil or criminal violation of the Securities Act.

McKim, on the other hand, argues in his briefs and at oral argument that signing the subscription agreement alters the parties' "already settled" agreement in several ways, specifically by: (1) adding a year to the holding period before McKim could trade the shares; (2)

[4]. . . [t]he issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(11) of the Act, which reasonable care may be demonstrated by the following:
(1) Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;
(2) Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available; and (3) Placement of a legend on the certificate or other document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities. While taking these actions will establish the requisite reasonable care, it is not the exclusive method to demonstrate such care. Other actions by the issuer may satisfy this provision. In addition, § 230.502(b)(2)(vii) requires the delivery of written disclosure of the limitations on resale to investors in certain instances.

requiring NewMarket's approval of otherwise legal trades; (3) invalidating the letters from NewMarket counsel regarding tradability, thereby shifting the burden to McKim to determine when the shares are tradable; and (4) requiring that McKim be an accredited investor. Each of these concerns deserves consideration.

First, even without the subscription agreement, the draft settlement agreement that McKim signed and returned to NewMarket's counsel included a one-year trading restriction running from the date the shares were issued. The January 5 letter to Magistrate Judge Whalin also stated that the shares would be "restricted." The one-year holding requirement derives from the rules on resale of restricted securities set out in SEC Rule 144. When pressed by the Court as to how McKim could have avoided the one-year holding period, his counsel explained that a securities lawyer told him that it may have been possible that the one-year statutory holding period had already run because the shares would be issued pursuant to the terms of a 2002 settlement. McKim does not provide a satisfactory explanation of how signing the subscription agreement changed his right to avail himself of this option if it were a legal possibility. The subscription agreement itself does not extend the holding period or even explicitly require a one-year holding period. It simply states that the shares have not been registered and therefore "cannot be sold" unless the transaction is "exempt from such registration requirements." Therefore, the subscription agreement alone would not have precluded McKim from taking advantage of an exemption, if such existed, that would have allowed him to trade before the usual one-year holding period.

The subscription agreement does require in ¶2 an "opinion of counsel, satisfactory to the Company" as to whether a transaction would be exempt from registration requirements. This

brings the Court to McKim's second concern, which is that the requirement that the "opinion of counsel" be "satisfactory" to NewMarket gives it unnecessary control of subsequent trades of the restricted stock it issues. McKim argues that the this enlarges NewMarket's discretion and ability to block a trade because it could presumably reject an opinion proffered by McKim as to the tradability of the stock on the grounds that the opinion was not "satisfactory" to NewMarket. McKim appears to anticipate bad faith, obstructionist, or unreasonable behavior on behalf of NewMarket in disapproving otherwise legal trades. According to McKim, absent ¶2, trades could occur without NewMarket's involvement at all.

The Court doubts that, as a practical matter, McKim could have had the restrictive legend lifted without NewMarket's involvement. *See, e.g.* U.S. Securities and Exchange Commission, Rule 144: Selling Restricted and Control Securities, http://www.sec.gov/investor/pubs/rule144.htm (last visited Mar. 14, 2008)("the transfer agent won't remove the [restrictive] legend unless you've obtained the *consent of the issuer* – usually in the form of an opinion letter from the issuer's counsel - that the restricted legend can be removed.")(emphasis added). Regardless, the Court does not believe that McKim's mere speculation that NewMarket *might* have acted unreasonably renders ¶2 inconsistent with the parties' agreement as to the issuance of the stock. It does not contravene the settlement agreement as expressed to Magistrate Judge Whalin.

Third, McKim argues that in ¶5 and elsewhere the subscription agreement shifts the responsibility for determining when the stock is tradable from NewMarket to McKim because it requires him to "rely on his own advisors" as to the "transferability of the Shares." McKim argues, this would "invalidate[] the letter from NewMarket counsel regarding the tradability of

the shares." True, NewMarket agreed in its letter to Magistrate Judge Whalin to "provide an opinion letter from counsel as to when the 300,000 shares and the 11,667 shares of IPVoice stock may be eligible for free trading." However, even in the later draft versions of the settlement agreement requesting the subscription agreement, NewMarket still was willing to issue a letter "regarding applicable transfer restrictions" of the shares issued to McKim. And, in fact, NewMarket appears to have tendered a draft of such a letter from its securities counsel that describes that "SEC rules require that McKim hold the shares for at least one year. . . ." Def.'s Mot. for Summ. J. Exh. V. That letter also describes the necessary steps for NewMarket's transfer agent to remove the restrictive legend after that period had run. Those steps include receiving an opinion letter from NewMarket's outside counsel after McKim's broker supplied certain documentation. The draft letter ends by stating, "assuming the paper work is properly provided by the selling stockholder and the facts referenced above such as the one year holding period are met, the legal opinion is routinely given and shares can be sold in the open market."

Thus, the subscription agreement itself does not alter McKim's rights with respect to the issuance of such an opinion letter. The statutes and regulations regarding when restricted shares become legally tradable exist independently of NewMarket's securities counsel's description of the process. Although a legal opinion letter from NewMarket's counsel may be necessary to remove the restrictive legend after the one year holding period, the subscription agreement does not change NewMarket's willingness to provide such a letter at the appropriate time.[5]

---

[5]At oral argument, McKim's counsel highlighted ¶2(g) of the draft settlement agreement that McKim signed which states, "[i]f it becomes possible for McKim's restricted shares to become unrestricted or trade at a date earlier than Februrary 20, 2006, [NewMarket] shall use its best efforts to insure that the restrictions on McKim's shares are lifted and available for trade at the earliest possible date." Even if the Court were to conclude that this language were a term of the settlement, it would not obligate NewMarket's securities counsel to find an exemption of less than one year where none legally existed. And, as noted above, the subscription agreement does not foreclose

Finally, as discussed above, the language requiring that McKim be an "accredited investor" appears intended to ensure that the transfer would qualify for a registration exemption and that McKim is not an "underwriter," to whom an unregistered stock transfer would violate the Securities Act. It would strain logic to conclude that NewMarket would have reached an agreement that would have subjected it to civil or criminal liability or that its intent in settling with McKim was to violate the Securities Act. Indeed explicit in the draft version signed by McKim is NewMarket's representation that its performance does not "violate . . .any provision of law, rule, regulation . . ." and the Court therefore concludes that the subscription agreement did not alter or diminish McKim's rights under the settlement agreement.

IV.

McKim directs the Court's attention to *Frear*, where the Kentucky Supreme Court held that "an otherwise unambiguous contract does not become ambiguous when a party asserts-especially post hoc, and after detrimental reliance by another party-that the terms of the agreement fail to state what it intended." 103 S.W.3d at 107. There, the parties to a commercial dispute reached an oral settlement, in reliance on which the case was dismissed. One party subsequently argued that the other party's agreement to sign a "release" also bound him to execute an indemnification provision. The court noted that "release" and "indemnity" are "related, but, nevertheless distinct, legal concepts" and that the settlement agreement's "clear" language requiring the party to execute a release did not implicitly obligate the party to execute an indemnification provision. *Id.* McKim argues that this case is similar to *Frear*, the only

---

the possibility that McKim's own counsel could present an opinion to NewMarket regarding an exemption other than the one-year "safe harbor."

difference being that the *Frear* involved the addition of an indemnity provision, while here NewMarket seeks execution of a subscription agreement. McKim argues that as in *Frear*, this Court "should not allow the terms of the settlement to be changed after a contract has been formed and relied upon." Pl.'s Resp. to Def.'s Mot. for Summ. J. 5-6.

The Court believes, however, that McKim's reliance on *Frear* overlooks the substantive difference between requiring "indemnification" and requiring a subscription agreement. Indemnification provisions alter a party's legal rights. By contrast, the subscription agreement is a normal provision that should have been anticipated and indeed "McKim's securities' counsel agrees that it would have been a good idea for NewMarket to request a subscription agreement . . ." Pl.'s Resp. to Def.'s Mot. for Summ. J. 6. That a subscription agreement may not be legally *required* does not locate it beyond those documents that are "reasonable and necessary" to carry out the provisions of the parties' agreement. Moreover that NewMarket did not require a subscription agreement when it issued securities to McKim on a previous occasion does not mean that it was unreasonable for it to request one in conjunction with the parties' settlement agreement. As discussed above, the subscription agreement did not deprive McKim of rights under the settlement agreement, nor did it impose additional burdens or duties upon him.

V.

Both parties request equitable relief - specifically that the Court determine the date of the settlement agreement and their rights and responsibilities under it. True, had McKim agreed to sign the subscription agreement, he could have traded his shares long ago and possibly for as much as $.64 at the end of the first quarter of 2006. However, his unwillingness to do so explains why this did not occur. For this reason, the Court does not agree with McKim that he

should be entitled to the cash value of the shares as of the date of the settlement, or even the cash value of the date that the shares would have become freely tradable had he signed the subscription agreement. And this also explains why the punitive damages provision providing for $250.00 per day for each day since settlement does not apply.

Having concluded that the execution of a subscription agreement is consistent with the substance of the parties' agreement and does not impose additional burdens on McKim, the only barrier to performance of the settlement agreement is McKim's refusal to sign the subscription agreement. The Court therefore declines to immerse itself in what appear to be continuing negotiations over the details and mechanics of effectuating the settlement agreement and issuing the stock. Once McKim signs the subscription agreement and the parties execute the settlement agreement, either party's failure to fulfill its obligations under the settlement agreement would provide the occasion to seek equitable relief.

March 18, 2008

John G. Heyburn II
Chief Judge, U.S. District Court

cc: Counsel of Record